IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Detention of | No. 87057-2-I |
| R.Z., | |
| Appellant. | UNPUBLISHED OPINION |

BOWMAN, A.C.J. — R.Z. appeals the trial court's order committing her for 14 days of involuntary treatment. She argues substantial evidence does not support the court's conclusion that she is gravely disabled under RCW 71.05.020(25)(a) and (b). We affirm.

FACTS

In May 2024, Bellevue police arrested 26-year-old R.Z. and charged her with two counts of criminal trespass in King County District Court. The police booked R.Z. into the South Correctional Entity (SCORE), which placed her in restricted housing because she had a history of violent behavior. While in jail, R.Z. displayed symptoms of psychosis and refused medication. The court eventually dismissed the criminal charges but ordered that R.Z. be detained for psychiatric evaluation.

On July 5, 2024, a community forensic evaluator referred R.Z. to a designated crisis responder (DCR), noting "active symptoms of psychosis including delusions, unpredictable mood, paranoia, perseverative thought process, and grossly impaired insight." On July 8, the DCR met with R.Z., and then SCORE transferred her to St. Francis Hospital. On the same day, the DCR

petitioned for R.Z. to be detained at an evaluation and treatment facility.  In the petition, the DCR stated that R.Z.'s cell was littered with food and personal items and that she was neglecting her grooming and hygiene.  And R.Z. spoke "nonsensically" or not at all and was "unable to discuss mental health symptoms or safety planning in a meaningful and reality-based manner."  On July 9,  Fairfax Behavioral Health admitted R.Z. for evaluation.  Fairfax was familiar with R.Z. because she had been admitted to the hospital in 2023.

On July 15, 2024, Fairfax petitioned for a 14-day involuntary commitment and the trial court held a probable cause hearing on the petition the same day. Susan Surdez, a licensed mental health counselor and court evaluator at St. Francis, testified on behalf of Fairfax.  She testified that when St. Francis admitted R.Z., she had low potassium and ketones in her urine but refused potassium supplements provided by the hospital staff.  Surdez also testified that R.Z. was calm and cooperative at St. Francis but refused to get on a stretcher when the hospital transferred her to Fairfax.

Wudma Darge, R.Z.'s father, also testified at the hearing.  He said that R.Z. lived with him and his wife until late June, "[a]bout 20 days ago."  Darge testified that while R.Z. lived with them, she would generally sleep during the day and be awake at night.  And that over the last year, she started urinating on the bed and couch and in her clothes.  He also said that R.Z. took several showers during the day but could not wash her clothes or prepare food for herself, so her mother did those tasks for her.  Darge told the court that he would allow R.Z. to come home only if she took her medication.

Finally, clinician and licensed mental health counselor Brian Hayden, the court evaluator for Fairfax, testified on behalf of the hospital. Hayden testified that after his evaluation, his working diagnosis for R.Z. was schizophrenia. He explained that he based his diagnosis on the fact that R.Z. was "endorsing multiple delusions," "unable to have a reality-based conversation," and "continues to have very limited insight" and "very poor impulse control." He also told the court that R.Z. seemed "particularly fixated" on the word "narcissist" but could not explain what the term means.[1] And Hayden told the court that R.Z. is unable to make a "reality-based" plan for how she will meet her needs for health and safety or how she will proceed if the hospital discharges her. In his opinion, R.Z. showed "severe deterioration of routine functioning by repeated and escalating loss of cognitive and volitional control over her actions . . . due to [her] behavioral disorder."

Hayden also testified about his interactions with R.Z. when she was at Fairfax a year ago. He opined that compared to 2023, she showed "superior deterioration in routine functioning." He explained that in 2023, she did not show signs of paranoia or agitation, but she currently exhibited them at the hospital. Hayden also said he did not believe R.Z. would continue taking medication if the hospital discharged her.

R.Z. testified on her own behalf. When asked if she would have a place to go if released, R.Z. said, "Yes. I'm a mother. I have my own house and family

---

[1] R.Z. frequently interrupted the court proceedings and used the word more than 20 times during the two-hour probable cause hearing.

and children." And when asked whether she would take medication, she said, "Yes. I'm pregnant."[2]

The court granted Fairfax's petition and entered findings of fact, conclusions of law, and order for 14 days of involuntary commitment. The court found by a preponderance of the evidence that R.Z. "suffers from a behavioral health disorder (working diagnosis: Schizophrenia), which has had a substantial adverse effect upon [her] cognitive and volitional functioning as evidenced by her symptoms and presentation." And it concluded that R.Z. is "gravely disabled" (1) because she "is in danger of serious physical harm from a failure or inability to provide for her essential needs of health and safety" and (2) because she shows

> severe deterioration in routine functioning, evidenced by repeated
> [and] escalating loss of cognitive and volitional control over her
> actions such that, outside the hospital setting, she would not
> receive care that is essential to . . . her health and safety.

Finally, the court concluded that a less restrictive treatment alternative was not appropriate or in R.Z.'s best interests because she was not "mentally stable," "taking care of herself outside the hospital," or taking her medication as prescribed.

R.Z. appeals.

## ANALYSIS

R.Z. argues the trial court erred by ordering that she be involuntarily committed. She contends that substantial evidence does not support the court's conclusion that she is gravely disabled under RCW 71.05.020(25)(a) or (b).

---

[2] The record shows that R.Z. is not a mother with her own house, nor was she pregnant.

For an involuntary commitment order, we review whether substantial evidence supports the trial court's findings of fact and whether those findings support the court's conclusions of law. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Substantial evidence is evidence sufficient " 'to persuade a fair-minded person of the truth of the declared premise.' " *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978)), *aff'd*, 138 Wn.2d 898, 982 P.2d 1156 (1999). Unchallenged findings of fact are verities on appeal. *In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

Involuntary commitment for behavioral health disorders "is a significant deprivation of liberty which the State cannot accomplish without due process of law." *LaBelle*, 107 Wn.2d at 201. To involuntarily commit a person for 14 days, the court must find "by a preponderance of the evidence" that

> [the] person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others.

RCW 71.05.240(4)(a). Under chapter 71.05 RCW, "gravely disabled" means

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). Subsections (a) and (b) of RCW 71.05.020(25) set forth "two alternative definitions of 'gravely disabled,' either of which provides a basis

for involuntary commitment." *LaBelle*, 107 Wn.2d at 202.[3]

1. <u>RCW 71.05.020(25)(a)</u>

R.Z. argues the court erred in concluding that she is gravely disabled under RCW 71.05.020(25)(a). We disagree.

When alleging grave disability under prong (a) of RCW 71.05.020(25), the State must present

> recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded.

*Labelle*, 107 Wn.2d at 204-05. The "failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors." *Id.* at 205.

The State need not show that an individual is in " 'imminent' " danger of harm. *Labelle*, 107 Wn.2d at 203. "The care and treatment received by the detained person in many cases will have lessened or eliminated the 'imminence' of the danger of serious harm caused by that person's failure to provide for [her] essential health and safety needs." *Id.* The State also need not show that an individual would fail to provide for all essential human needs; only that their failure to provide for at least one human need would result in a high probability of serious physical harm unless adequate treatment is afforded. *See, e.g.*, *In re Det. of A.F.*, 20 Wn. App. 2d 115, 126-27, 498 P.3d 1006 (2021) (appellant's bipolar symptoms preventing him from seeking out and obtaining appropriate

---

[3] *LaBelle* cites the definition of "gravely disabled" under former RCW 71.05.020(1) (1979). Because the definition has not changed, we cite the current statute, RCW 71.05.020(25).

care for Parkinson's disease supported the trial court's "gravely disabled" conclusion under former RCW 71.05.020(24)(a) (2021)).

Here, the court found that R.Z. suffered from a behavioral health disorder and had a working diagnosis of schizophrenia. And it found that when R.Z. was admitted to the hospital, she had low potassium and ketones in her urine and refused potassium supplements when provided to her by the hospital staff. While R.Z. was calm and cooperative, she was "unable to engage meaningfully." And when she was at home, R.Z. frequently urinated on herself but denied that anything was wrong and did "not think she needs help." Her parents fed her, cleaned up after her, and washed her clothing twice a day. The court found that R.Z. sleeps during the day, stays awake at night, is selective about eating, and makes delusional statements but does not want to take her medication. These findings support the court's conclusion that R.Z. was "in danger of serious physical harm from a failure or inability to provide for her essential needs of health and safety," making her gravely disabled under RCW 71.05.020(25)(a).

Still, R.Z. argues the evidence does not show recent, tangible evidence of her inability to provide for her needs. She points to evidence that throughout her hospitalization, she was generally alert, well oriented, "usually" took her medication, and slept and ate well. But alleviation of an individual's inability to care for oneself while in a hospital setting does not indicate the individual is necessarily able to function outside of that controlled environment. *See Labelle*, 107 Wn.2d at 210 (finding there was sufficient evidence that appellant was

7

gravely disabled even though his condition had "stabilized or improved slightly while in the hospital").[4]

R.Z. also contends that no evidence shows her behavior is connected to a behavioral health disorder and characterizes the court's order as imposing " 'majoritarian values' " on someone who chooses a lifestyle that might be " 'eccentric, substandard, or otherwise offensive.' " *Labelle*, 107 Wn.2d at 204. But Hayden testified that because of R.Z.'s behavioral disorder, she suffered from "an escalating loss of cognitive and volitional control over her actions" and "endors[ed] multiple delusions." And R.Z. was unable to "make a reality-based plan for how she will meet her needs for health or safety" or "understand that she needs to manage her activities of daily living." His testimony supports the courts conclusion that R.Z.'s behavior was connected to her behavioral health disorder. And Hayden's testimony is corroborated by the evidence that R.Z. was urinating herself and displaying delusional behavior, such as her testimony that she was pregnant and a mother with her own home.

Substantial evidence supports the court's conclusion that R.Z. was gravely disabled under RCW 71.05.020(25)(a).

2.  RCW 71.05.020(25)(b)

R.Z. argues the court erred in concluding that she is gravely disabled under RCW 71.05.020(25)(b). Again, we disagree.

---

[4] We also note that during his testimony, Hayden pointed out that while R.Z. was at SCORE, "she was being fed and clothed and housed, yet was not able to meet her needs and was showing this [potassium] deficit in her nutrition."

When alleging grave disability under prong (b) of the statute, the State must show "recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208; *see* RCW 71.05.020(25). The evidence must also show that involuntary treatment is "*essential* to an individual's health or safety," and it should show "the harmful consequences likely to follow" if the court does not order treatment. *Id.* In sum, the individual must be "*unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to [her] need for treatment." *Id.*

Here, the court found that R.Z. was "exhibiting active symptoms of a behavioral health disorder." It noted that Fairfax had treated R.Z. in July through September 2023 for "similar symptoms." During that period, R.Z also resisted medications. But she then started taking them, so the doctor approved her discharge to a shelter, where she managed to care for her own needs. During that time, R.Z. had some delusional thoughts but significantly improved on medication. But in July 2024, the court found that R.Z. had deteriorated since 2023 "to the point she is nonsensical, disheveled, paranoid, uncooperative and illogical." And she spoke in "pressured tones," responded to internal stimuli, and did not believe she needs treatment. These findings support the court's conclusion that R.Z. showed a severe deterioration in routing functioning "such that, outside the hospital setting, she would not receive care that is essential to . . . her health and safety," making her gravely disabled under RCW 71.05.020(25)(b).

Still, R.Z. argues substantial evidence does not support the court's finding that she suffered a "deterioration." But the record shows otherwise.

According to R.Z.'s 2023 discharge papers, she was "capable of independent living" at that time and able to perform activities of daily living and verbalize her needs. And Hayden testified that R.Z. did not show signs of paranoia or agitation in 2023. But in 2024, R.Z. was paranoid, delusional, illogical, disorganized, agitated, and uncooperative. Hospital staff observed she responded to internal stimuli, had trouble processing information, and could not have a reality-based conversation or engage in a reality-based discussion about her needs. And her father testified that she had started urinating herself at home. Hayden also testified that he did not believe R.Z. would continue to take her medication if the hospital discharged her. And that in his opinion, R.Z. showed severe deterioration of routine functioning by repeated and escalating loss of cognitive volition control over her actions. Substantial evidence supports the court's finding that R.Z. suffered a deterioration.

Because substantial evidence supports the court's conclusion that R.Z. is gravely disabled under RCW 71.05.020(25)(a) and (b), we affirm.

_____, ACJ

WE CONCUR:

_____
Díaz, J.

_____
Mann, J.

10